The next case on the call of the dock is Agenda No. 10, Case No. 126008, Palos Community Hospital v. Humana, Inc. and Humana Insurance Company. Mr. Seigel. Good afternoon, Your Honors, Counsel. Everett Seigel on behalf of Plaintiff Appellant, Palos Community Hospital. May it please the Court. This appeal raises two questions. First, is the judge created testing the waters exception to a party's absolute statutory created right to a substitution of judge consistent with the plain language of the statute? And second, should the Court decide to maintain the testing the waters exception, did Palos test the waters under the facts and circumstances of this case? Your Honors, we submit that the answer to both of these questions is no. The Court should retire the testing the waters exception because it is extra textual. It is unworkable in practice, and as the Fourth District has noted, it affirmatively frustrates the purpose of the substitution of judge statute. It is extra textual because the only source of state policy is the language that the General Assembly put in the statute itself. The text has only two, not three, timing limitations. A substitution motion must be brought before trial, where the hearing has begun, and before the Court has ruled on a substantial issue. There is no third, freestanding, timely requirement, much less one that includes testing the waters. Applying the statute as written has worked fine in the Fourth District for close to two decades, and will provide clarity to the district and circuit courts in the rest of the state. But even if this Court is inclined to keep the doctrine, it still should reverse because the decision of the trial and appellate courts in this case have expanded this exception so broadly that it has swallowed up the absolute statutory right. There were only two short hearings before Payless filed its motion for a substitution of judge, Your Honors. Both hearings were transcribed. We're not dealing with bystander reports. It is important to remember that at both hearings, the trial court stated on multiple occasions that it was keeping an open mind on whether the appointment of a discovery special master was proper. At the first status conference, a new judge appeared on the bench, to the surprise of both parties. At the second, the judge set a briefing schedule. It is uncontested that the trial court did not issue any substantial rulings, nor was there even commentary about a matter of substance. During the first hearing, the trial court volunteered a discussion, volunteered during the discussion with the special master that there was precedent supporting the predecessor judge's decision to appoint him. The trial court made that statement again during the second status conference. This twice-passing reference to some precedent was the hook for both the trial court and the appellate court to hold that Payless, that the court had tipped its hand and that Payless had lost its right to substitution of judge. But what exactly did the court tip its hand on? Humana concedes as it must that Payless could have sought a change as a matter of right after the first hearing. And I would point the court to pages 5 and the top of page 30 of their briefs for that. But there is no difference between saying that there is precedent during the first hearing and saying the same thing and the exact same thing during the second. There cannot be enough under any articulation of the testing of the waters exception for a party to lose this absolute statutory right. Now, as I mentioned, the original reference to precedent was volunteered by the trial court during a colloquy with the so-called discovery special master, who was a retired circuit court Cook County judge, who appeared at the hearing, stepped up to the bar when the case was called, introduced himself on the record, and with no standing to be addressing the court, began acting as an advocate for his own position and underscoring that the trial court hadn't tipped its hand on anything. Not even the discovery master's appointment, but instead was truly keeping an open mind. The court subsequently incorrectly ruled that the discovery master's appointment was indeed unconstitutional, and the court did not even follow his discovery recommendations. Now, review of a denial of a motion for a substitution of judge, Your Honor, is de novo. And that is because the trial court has no discretion to deny a timely and properly filed motion. Yet, because testing the waters doctrine, appellate court's review focuses on subjective factors, such as whether the parties could have learned something about the trial court's views on the merits of the case, even when there hasn't been a ruling. Over time, this test has become truly elastic, and it was improperly applied by the first district. And I quote from their opinion, There was never any reluctance to strike the discovery master. There was a reference to precedent, but that was it. And there was absolutely no discussion of the substance of his report. Under any known testing the waters standard, this is not testing, Your Honors. And as Justice McDade noted in her concurrence in In Re State of Gay, tipping the hand leaves us poised at the top of a slippery slope. We suggest, Your Honors, that we have reached the bottom of the abyss in this case. So while we urge the court to follow the textual analysis applied by the fourth district in Shem, and drop the testing the waters doctrine from Illinois jurisprudence, if the court decides to keep the doctrine in some form, it should hold that Palos did not test here. Now, I'd like to talk just briefly. In this case, the judge in this case from the first district certainly was relying on prior precedent from the first district that upheld the concept of testing the waters, correct? Yes, the first district and the fifth district and the third district have all upheld testing the waters in some form. So the judge was merely following the precedent in that district? I would agree, Your Honor, except that even in the first district, the case law holds that testing the waters has to go to the merits. And there's no way to say that the procedural issue as to whether or not a discovery special master, his appointment, which is all that the court conceivably could have commented on, that does not go to the merits, Your Honor. So even under the test that it was announced, for example, in the first district in the marriage of Enri Admon, I believe, that goes directly to the merits of the case. And so that's why we think this has swallowed up the rule. So the case went ahead. She denied the motion. The case went ahead and went to trial. And what was the verdict? The verdict was for the defendants, Your Honor. And how much money? Zero. Oh, I'm sorry, for defendants. Yeah. So what are you asking for? We're asking for a reversal of both the appellate courts and the trial courts. And under well-established case law from both this court and appellate courts across the state, every order since the wrongful denial of the request for substitution to judge is void. So it would be a remand to a new judge to essentially take the case from that point. So then let me ask you this final question. This Court has spoken recently over the last few years a great deal about what void means, what jurisdiction means. Generally, the idea is if the Court has personal jurisdiction, subject matter jurisdiction, unless we're talking about a constitutional issue, a circuit court has jurisdiction to hear a matter, and an error does not relieve the court of jurisdiction. So how do we get to the – how do we reconcile those cases with the position here that an error, under your theory, that the trial court error here was such that the rest of the case has to be vacated and you have to start over? Oh, I think there's a number of reasons, Your Honor. First, there's a difference between void and voidable as it relates to jurisdiction versus a statutory remedy. So I think that's an important distinction, and we're talking here about a statutory remedy. This Court has held, and I believe it's in In Re, the Marriage of Dominique F., that an improper denial of a – and it was under the venue statute at the time, but an improper denial of a proper motion leads to all subsequent orders being void. And I would note, Your Honor – What's the theory to that? Why is it void? Because you have a right, a statutory right, to a new judge to hear your case. And so, you know, as Your Honors know, when you try a case, there are hundreds, maybe thousands, of discretionary decisions that are made by that trial judge after they make the wrongful decision to deny the substitution. Now, if the legislature has said you're entitled to a different judge to make those decisions, then you can't – that can't be undone, so – unless you do go back and have a new judge to do that. And there's no way to say that a subsequent judge would rule the same way. You know, in Becker v. Cooper, it was reversed after a jury trial, and that's the Third District. In Nasrallah v. D'Avelia, that's the First District, 2001. That was a reversal for an improper denial of a substitution to judge after a jury trial. In Shump v. Shump, that's the Fourth District case. That was after a bench trial. That case lasted six years. It had 36 hearings and had over 200 docket entries preceded by five years of prior litigation. And the court ultimately reversed it because of the improper denial of the statutory right. So I think there is a difference between the legislature giving you a right, to having a different judge decide that, than perhaps a jurisdictional issue, Your Honor. So, you know, the remedy in this instance, you know, when the trial judge, in our opinion, wrongly denied the substitution of judge, we asked the trial court to certify the question, like was done in Bowman. And I think, Justice, we'll recall that that was done in Bowman. The question was certified and went to the Fifth District and then ultimately up to the Supreme Court. That was denied. Payless also actually took a writ of mandamus and asked for a supervisory order from this court. We did not want to – we knew that this was an interlocutory order, that we had to wait to the end of the conclusion of the trial in order to seek relief. It was not something that we wanted to wait at the end and have to redo. We tried within the framework of – the limited framework of trying to seek interlocutory relief in order to get relief. But, unfortunately, the trial court denied our Supreme Court Rule 308 petition. So we had no success getting an interlocutory appeal on the legal issue. And this court, unfortunately, denied our petition for a writ of supervisory order and for mandamus. So the relief that Humana is seeking, with respect to, you know, what I believe is kind of a sleight of hand to turn all this into harmless error, you know, that would be a retroactive application to Humana, or to Palos in this case, after years of this court saying that an improper denial of a request for a substitution of judge or an improper denial under the venue statute voids all subsequent orders. Counsel, getting back to the continued viability of the testing of waters doctrine, when you read the broad language of Bowman – you cited Bowman a minute ago – when you read that broad language as it relates to judge shopping, don't you read that as this continued, I guess they've been calling it judicial gloss, on the substitution statute is still viable? Your Honor, well, I think Bowman was decided on a narrow statutory interpretation. I'm not talking about the holding at Bowman. I'm talking about the broad language in paragraph 18 about the judge shopping. Yes, and there was an extended discussion in Bowman which was unnecessary for the ultimate holding in the case because the holding did turn on the language of the words in this case as it is in the statute, and the court concluded that the in this case language meant that the voluntarily dismissed and refiled case meant that it was the same case and there was a substantial ruling, so testing of waters never came up. But I think in that regard, Judge, the Fourth District's rationale in Shemp makes some sense. The legislature has seen fit to give every litigant one change of judge. You know, judge shopping is a pejorative term and it may mean a lot of things to a lot of different people, but the legislature saw fit that everybody, as long as they file it before a trial or hearing has begun or before a substantive ruling, they're entitled to a change of judge. And, you know, as the as has been shown, there's no discretion to deny that, and it needs to be liberally applied, and there is a case, for example, out of the First District, and I believe it is, and I think it's the Nasrallah v. Davila case, but I'll confirm that, Your Honor, where there was a defense firm in the city of Chicago that took a substitution of judge every time they were assigned to a particular trial judge. And that's, in fact, how the First District knew that the motion for the substitution of judge was timely, is because they had a pattern and practice of taking a substitution with respect to that judge. So I guess depending on how broad your definition of judge shopping is, that firm was, in fact, judge shopping. They decided they didn't want that judge to try any of their cases, and the First District has said, as long as the other statutory requirements are met, that that was an appropriate thing for them to do, because the legislature of the General Assembly has said that that's appropriate. So I think, you know, as the Fourth District has noted, everybody gets to pick not to pick a judge, but gets to anti-select a judge. Every litigant, as long as there hasn't been the start of a trial or a hearing, and everyone knows when that starts, or ruling on a substantial matter, gets to decide, I don't want this judge to decide my case. And they don't have to state why. And that can be characterized as judge shopping, but that's the legislature's prerogative. Now, the judge shopping concern really arises from the old venue statute, where it used to be that the parties had to plead, but not prove prejudice. And as the courts have noted in that circumstance, that was open to abuse, because parties could plead prejudice against a judge without having to prove it, when they had no sincere fear of that. And the purpose of that statute, the venue statute, was so that the parties did not have to try a case before a judge who was not prejudiced. And, Your Honors, the judges were helpless. They could not defend themselves. They couldn't ask why the individual litigants who signed these affidavits were saying that they were prejudiced. They just had to grant those. And that's why the judicial gloss developed, because the courts wanted, under those circumstances, to stop people from taking changes if they had an indication of how the judge was leaning. The legislature in 1993 did away with all that. And I think the analysis of the Fourth District is on point on that, Your Honor. Is it ever appropriate for the trial court to consider the circumstances surrounding the motion? Well, Your Honor, I think this court, it has stated in Bowman, you know, it mentioned that the court has, it mentioned the Hoffman case. You know, I'm not here to say that this court, which has supervisory authority over all the courts in the state, and the circuit court judges certainly have a number of tools in their toolboxes to protect themselves from potentially abusive conduct that they couldn't. But the question then becomes, is testing the waters the right doctrine to protect the courts from bad conduct, from this hypothetical kind of bad conduct? And we respectfully submit, Your Honors, that testing the waters isn't the right vehicle to do that, that the courts have many tools in their inherent powers to protect themselves. Outside of testing the waters, if someone is bringing a change purely for the purposes of delay or for improper motives. So that testing the waters is kind of like using a cannon on a net. And what testing the waters does is it creates problems for litigants and for judges, and it's creating issues because it's the noble review. And so you have the situation where people are now taking appeals and appellate courts are having to divine what was said and what was meant, even when there is a transcription. Now, the one thing we do know is that the Fourth District has not had testing the waters for a very long time. And there has been, as far as we know, no wholesale abuse of the substitution of judge statute. There has, as far as we know, hasn't been parties coming in. I see my time is up, Your Honor. If I may just have 30 seconds. For the reasons stated in our briefs, we had asked you to reverse the trial in appellate courts. Thank you. Thank you, Mr. Seigel. Thank you. Ms. Flint? Good afternoon, Your Honors. My name is Tacey Flint. I'm here on behalf of the Appellees Humana Defendants. Across decades, this court, the appellate court and circuit courts throughout Illinois, have applied the test the waters doctrine when adjudicating motions for substitution of judge. Under earlier versions of the statute, this court repeatedly said that the test the waters doctrine is necessary to prevent judge shopping. Now, when the General Assembly enacted the currently operative version of the substitution statute in 1993, it did so against this consistent backdrop of judicial rulings. And the General Assembly is presumed to be aware of this court's decision. If it wants to reject this court's interpretation of the statute, it has to say so clearly. Legislative silence is understood to mean legislative acquiescence to the court's decisions. So if we're to conclude that the General Assembly intended to eliminate test the waters in 1993, we would need to see a clear indication that it was doing so. And certainly, the General Assembly could have given a clear indication. It could have used the same language that it used in the voluntary dismissal statute, which provides that a plaintiff is entitled to move for voluntary dismissal at any time before a trial or hearing. Just nine years earlier, in 1984, this court in Kale v. John Deere had interpreted that language to preclude application of the test the waters doctrine. So the General Assembly could easily have adopted the same language to eliminate test the waters from the substitution statute if it so chose. But it didn't. What the General Assembly did is largely keep the statute as it had been. It eliminated the requirement that the party seeking substitution state a fear of prejudice. But it retained the same timing-related provisions that had previously existed, the requirement that an application be filed before trial or hearing and before a ruling on a substantial issue. And it added the requirement that the right to substitute without cause must be timely exercised. Sotomayor, I'm a little to pursue that for a minute. You think that this has became, I'm not sure if element is the right word, but a requirement. I think you said in your brief 1, 2, 3. That's right. Is that how the statute is written, though? Isn't this section say 2-1001a2, substitution of right, as of right, period. When a party timely exercises his or her right to substitution without cause as provided in this paragraph 2, period. One, each party shall be entitled to one substitution as of right. Two, an application must be made by motion if it's presented before trial or hearing before a substantive ruling. So in other words, the 2 is the title of the section. And then 1, small 1 and small 2 is what defines those terms, is how I would read that. You seem to say that the legislature does not say, this statute does not say, that the petition must be timely beyond the definition of timely that's in the statute, which is before trial or hearing. Well, if timely were defined to mean before trial or hearing, you would expect that first sentence to read timely as provided in Romanet 2, because Romanet 2 is where before trial or hearing and before ruling on a substantial issue are included. What it actually says is, when a party timely exercises his or her right to substitution without cause as provided in this paragraph 2, and as you observed, paragraph 2 is the entire statute related to substitution without cause. Now, what as provided in this paragraph 2 is modifying is right to a substitution without cause, because this section, paragraph 2, establishes a new right that didn't previously exist in this form. And so by writing as provided in this paragraph 2, meaning this entire paragraph 2, the court is saying, excuse me, the legislature is saying we have a, we've created a new right and the right is defined as provided in this paragraph 2. And then it further says, that right, the right to a substitution without cause as provided in this paragraph 2 must be timely exercised. As defined by section 2i. Well, that is not, that does not appear here. Now, if the question is, does Romanet 2, does that mean those are the only constraints, the only timing-related constraints on exercise of the right to substitution without cause? There are. We can continue to talk about that, but I think Justice Burke raised an important question. In Bowman, the court specifically says the idea of testing the waters, et cetera, is not expressly stated in the statute. Correct? Correct? The court definitely said it was not resolving the question of testing the waters. So it's been called a judicial gloss. It did call it a judicial gloss. That's right. So something beyond the plain language of the statute. Testing the waters arose as a judicial gloss, as an equitable doctrine. And how does that work? How does that equitable principle work in relation to a statute that is called substitution as of right? Well, the answer, part of the answer comes from Bowman. So it is a substitution as of right. And in Bowman and other cases, the court has talked about how the right is absolute. And in Bowman, Justice Kilbride, in a solo dissent, argued if the right's absolute, that means it's unequivocal. The only constraints on applying it are these timing requirements that are described in Romanet II. And the court rejected that. Now, of course, it did not resolve testing the waters, but it rejected that form of interpretation. It specifically said, we reject a narrow and literal interpretation of the statute that would create a loophole, that would frustrate the purposes of the statute. And Bowman's not the only case that said that. In multiple cases, this court has rejected a narrow and literal interpretation of this statute, the prior change of venue statute, that would allow the purpose of the statute to be frustrated. Hoffman v. Hoffman. The trial court denied a petition that was filed for purposes of delay. The appellate court reversed, because it said, just as your questions were raising, it said, the statute doesn't say you get to deny a petition just because it's filed for purposes of delay. The statute creates an absolute right. And this court reversed the appellate court. It said a trial court does have discretion to consider the circumstances surrounding the filing of a request for substitution. And to answer your question from earlier, Justice Garmon, the answer to that question is yes. The court said it in Hoffman. The court said it again in Bowman. A trial judge does have discretion to consider the circumstances surrounding the filing of a motion. Can I ask, how broad is testing the waters? How broad is that principle? You know, we've got the statutory elements. And so how broad is that? How far do you go to test the waters? When are the waters tested? Testing the waters exists to prevent abuse of the substitution statute. And so it looks at two principal things. Has the party, first is, has the party moved for substitution at the earliest practical moment? And that's essentially a safe harbor, because a party that moves for substitution at the earliest practical moment, there's no reason to infer that that party is acting inappropriately or is acting to take tactical advantage. And then the second piece is- That's normally defined as before trial, before there's been substantive rulings, correct? I'm sorry, I didn't hear the question. Before trial, before substantive rulings, correct? Does that mean, I think the earliest practical moment means at the time, you know, that it makes, the first time that the party has the opportunity. What is not the earliest practical moment, what clearly fails that requirement, is if a party engages in procedural maneuvering in order to obtain greater information or in order to generate an advantage for itself. And what kind of information is that? Information on the judge's views regarding the case. So that was obviously exactly what occurred in Bowman when then-judge Overstreet, you know, first handled the case. Lots of rulings, the party certainly knew his views on the case. When it came back as a newly filed case, again, you know, that was a reason to, it wasn't clear at the time, that's why it was certified. But it became clear that that party was acting as she was for it to engage, to gain a tactical advantage. And that is inconsistent with the requirement that a party file a motion for properly. That is one of the constraints on an absolute right. An absolute right does not come into existence until a party has filed the motion properly. Now, you asked how broad is testing the waters? Substantively, the second part of it is, has the party, by failing to move at the earliest practical moment, by engaging in procedural moving, excuse me, maneuvering, has the party been able to discern the judge's views? Now, in many cases, that will be clear. It's certainly very clear in this case because, as my friend on the other side observed, we have the transcripts. We know exactly what was discussed. And further, we know that Pelos did engage in a form of procedural maneuvering by generating a second hearing through which it could obtain Judge Shelley's repeated views on the recommendation from the discovery master. Now, if I could talk a little bit about what was happening during those two hearings. Now, these hearings came on the heels of the recommendation by the discovery master, retired Judge Sullivan, that Pelos be ordered to produce documents reflecting what rates Pelos expected to be paid by Humana. Now, what Pelos knew, but hadn't yet revealed, is that it had ordered, destroyed all of the data held by JDA, which came under the cover of that recommendation. So the question of how Judge Shelley was going to handle Judge Sullivan's appointment and his recommendation was of critical significance to Pelos. And I have to respectfully disagree with opposing counsel. A lot more was discussed at those hearings. At the first hearing, Pelos argued against the substance of the recommendation. It said the recommendation was wrong because it was asking for a reconsideration of the former judge, Judge Taylor's, order on discovery. Judge Sullivan, who, as noted, was there, disputed that. And by the way, just to clarify the record, Judge Shelley specifically asked counsel for Pelos, Mr. Seigel, whether it was acceptable to him that Judge Sullivan speak at the hearing and that Judge Shelley ask Judge Sullivan questions, and Mr. Seigel said yes. So Judge Shelley asked those questions of Judge Sullivan, and Judge Sullivan said, this is not a recommendation, excuse me, a reconsideration of Judge Taylor's ruling. So the substance of the recommendation was discussed. Also, the constitutional validity of the appointment was discussed. And Judge Shelley did not merely observe that there was precedent. She observed, I'm inclined to have Judge Sullivan stay involved with the proceedings. Now, counsel for Pelos is correct that, in my view, in our view, if Pelos had moved for substitution of judge immediately after the first hearing, that would have been timely. Now, it did gain some insight into Judge Shelley's thoughts at that first hearing, but that was the earliest practical moment. And testing the waters, it's not a trap. It's not designed to trap parties that have no opportunity to move for substitution. And so it's still timely if a party is filing at its earliest practical moment. But that's not what Pelos did. It created a second hearing by separating its objections to Judge Sullivan's recommendations and its objections to Judge Sullivan's appointment. The original plan was for both of those things to be briefed at once, but Pelos filed the objections in one brief and then a separate motion on the appointment, which gave rise to a presentment hearing. So the parties returned to court in front of Judge Shelley. And keep in mind, this was before any ruling could have been entered on the recommendation. They returned to court in front of Judge Shelley, and counsel for Pelos, again, raised issues as to the content of the recommendation and the appointment, went so far as to say the two were intimately tied together, not strictly a procedural issue, and then observed to Judge Shelley that it had done extensive research, and if there were any decisions of which she was aware, asked her to let them know. And once again, she observed that there was precedent for the appointment. It was only after that that Pelos moved for substitution, after it had gained through two hearings an indication that Judge Shelley was likely to allow Judge Sullivan to remain part of the case, and therefore likely to accept his recommendation, which from Pelos's perspective was a ticking time bomb in light of the concealed JDA records. So that is how this case proceeded. Now, to answer some questions that you asked about the remedy. It's not void. As you observed, Your Honor, under LVNV, rulings after a denial of substitution cannot be void under the Court's modern jurisprudence. So what is it? Even if the substitution is erroneous, what we do to examine how to treat the case after that is the same as we do with any other trial court error. We look at whether it was harmless. That's what this Court said about an erroneous denial of a peremptory strike of a juror in Rivera. In that case, there is no suggestion that the juror should be excused for cause, just like there's no suggestion that Judge Shelley should have been substituted for cause. The defendant argued that it was impossible to tell whether a different juror would have voted differently, just like Pelos argues that it's impossible to tell whether a different judge would have produced a different outcome. But this Court in Rivera rejected that argument. It held that if the record showed that no rational juror would have voted to acquit, then the error was harmless. If there's the majority of this, if the statutes have any meaning, it must have some, you know, consequence to it. If the Court erroneously denies the motion and the case goes forward, then on appeal, what would be an argument that the Court erred in denying the motion for substitution of judge by right under the statute, and then what? Where does this go? Well, just so in Rivera, the Court said, would a rational juror have voted to acquit? The Court examined the record and concluded no. Similarly, the Court can review the record and say, would the outcome have been the same? And the answer in this case is extremely clear, because we have the benefit of both the jury's unanimous verdict and the appellate court's unanimous affirmance of the decision below. We know that in the view of the First District, and of course, none of this is, no rulings other than substitution have been appealed to this Court, so it's final. We know that Judge Shelley did not commit any errors as to any of the other rulings. So in that circumstance, it really does not make sense to invalidate any of her rulings. And I'd like to point this Court to Inree Estative-Wilson. So that case was about substitution for cause. The majority concluded that the trial judge, a trial judge had decided, had denied a motion for substitution of cause of herself because the motion was facially deficient. And the appellate court reversed. It said, a trial judge is not allowed, the statute does not permit a trial judge to decide a motion for substitution for cause. This court, again, just similar to Hoffman, similar to Bowman, reversed the appellate court and said, we're not going to adopt an interpretation of the statute that would allow for this kind of abuse. That would allow a party to file a facially deficient motion for substitution for cause and bring the proceedings grinding to a halt while another judge reviews that motion. So this court said it was all right to deny the motion. Now, in a concurrence, Justice Freeman, joined by Chief Justice Burke, disagreed with that ruling on the statute. Said that the trial judge shouldn't have decided whether the motion for substitution for cause was deficient. But he concluded that reversal was not appropriate. He concluded that the error was harmless. Because the motion was properly denied, another judge would have denied it just the same. So Justice Freeman would have affirmed the circuit court on grounds of harmless error. And that same analysis applies here. Now, Palos has argued that if that analysis, if a harmless error style review is applied in this context, that means the right will become unenforceable. I think, which is sort of a flavor of the same question you're asking, Your Honor. Well- Counsel? Okay. Goes fast. Thank you, Your Honors. We respectfully request that the judgment be affirmed. Thank you. Mr. Seigel? Thank you, Your Honor. Your Honor, I'd like to start where counsel for Humana left off. I think the proposal by Humana is truly radical. The suggestion is, is that the grant or denial of a motion for substitution of judge is an evocatory. If a judge then decides, sitting in judgment of themselves, that a party tested the waters, then you can't get review until it goes to the appellate court. And now, according to Humana, then that's harmless error. So you're not going to get a reversal. And what you have to do then is prove actual prejudice. So what that does is really reads out of the statute a two. It makes it a nullity.  That analysis just cannot stand where the legislature says you have an absolute right to take a change without having to say the reason for it. It is a right that should be liberally construed according to this court's case law. Your Honor, I'd also like to just briefly address this issue with respect to the documents. And I don't want to get very deep into it. But I will say that we believe that the trial court had erred when it sanctioned Palos and instructed the jury to take an adverse inference. We also believe that a new trial judge would conclude that nothing was lost. And because Palos only asked for its own sensitive patient data to be destroyed. And Palos had a complete copy of that data, which it had produced. And in any event, the third party that had destroyed this data really hadn't destroyed it. Because after they had advised Palos and Humana that they did, they discovered a backup. And we know that if the data exists, there cannot be spoliation. Now, counsel for Humana spent a lot of time talking about what transpired in the hearings. And I respectfully suggest that she got some of the chronology wrong. And we're lucky here. In most cases, we're dealing with bystander reports. But in this case, because it was a large, high-dollar case on the commercial call, we had certified court reporters through the entire case. And so we're not hamstrung by a bystander's report. We actually have the exact words that were said by the parties and the trial judge in both hearings. And they're not long. I think it's maybe under 1,000 words total between the two. And I think it makes sense to briefly walk through them. And they can be found in the record at A25-44 and 54-62. When the parties showed up for that status in March of 2017, March 21st to be specific, the fact that Judge Taylor had been reassigned to the Chancery Division was a surprise to both parties. Nobody knew that that was the case. And as we said, the retired judge had made his recommendation, and he even addressed it to Judge Taylor. He didn't address it to Judge Shelley. The case was called, and as I mentioned, the retired circuit court judge stepped up along with counsel of record. The trial judge, Judge Shelley, indicated on the record she was not clear, and I quote, not clear on what counts remain and what parties are still involved. She indicated that she had reviewed the file, quote unquote, last night. She stated that it would be very helpful, quote unquote, if the parties could give her a quick overview. The plaintiff went first and noted that the predecessor judge, Judge Taylor, had set up a procedure to object to the retired judge. The court then asked questions of the retired judge and then allowed Humana to weigh in. After Humana's counsel spoke, the judge posed this question to the parties. This was from the judge. However, I would first need for everyone to look at Judge Sullivan's recommendation. Does anyone have a problem with his recommendation? Even though, of course, I'm going to be very detrimental to the work that Judge Taylor has already done on this case. So the report has been presented to the court. Do you have any comments? This is on 832. Now, I don't know what Humana's proposing. Should Palos have said at this point, Judge, we're not going to respond to your questions because we don't know if we need to take a change. That would be rude and inappropriate. And this is a direct question from the court. And in response to that, all that Palos said from this direct question was that Judge Taylor had established a procedure for the objection to the report and that Palos would like to file a written objection. And Palos's counsel at that point advised that it would object on two grounds. Now, this is not inconsistent with practice in the court of Cook County. Just basically said that the objection would be under the Civil Practice Act and that what Judge Sullivan had done was an improper reconsideration of Judge Taylor's orders. And in response, the trial judge said that she saw no need to deviate from the procedure established by Judge Taylor, meaning the procedure to object to the report. She then stated she would keep an open mind, one of many times that the trial judge said that during the course of these proceedings. A briefing schedule was set and it was at that time that the retired circuit court judge, whose appointment was ultimately ruled unconstitutional, then interjected himself into the proceedings and started arguing that he did not, in fact, reconsider any of Judge Taylor's discovery rulings. Judge Sullivan, this is in the record, I do have one very short statement. And in response to that, not in response to anything that counsel for Palos had said, Judge Shelley said, my understanding is your involvement was to assist the court in trying to, you know, get through this discovery process. And there is precedent that says a trial judge has that discretion. That's on A36. Those 36 words were essentially the hook for saying that Palos lost its right to take the substitution of judge. That statement has been the linchpin this entire time that the waters have been tested. That second status conference, Your Honor, this played out exactly the same. As consistent with Cook County practice, counsel came in and there was a presentment of a motion to strike. When motions are presented, there's usually a thumbnail description of the basis of the motion. In response to that, Judge Shelley again said that there's some precedent and she again said that she was keeping an open mind. And the hearing concluded with her saying, I'm looking forward to reading the papers. I'm looking forward to seeing what you have to say. And then she ultimately agreed with Palos. That's the extent of it, Your Honor. Some precedent with respect to a purely procedural issue. And that is the problem with what Humana is proposing. Because their proposal is completely elastic. And I submit, Your Honor, that they will not say what testing the waters is. If you go through their briefs, they start out and talk about testing the waters is relating to the merits. And then they talk about it being a major issue in the case. And then it changes and goes to another standard. Counsel, in your recitation of the second date, April 13th, you left out that Counsel for Palos asked the judge, well, Judge, if there's something else you think we should be looking at, we would certainly take it under advisement. And then the judge made yet another statement, I was not shocked by the position my predecessor took. That's correct. The argument, I guess, is that Palos was soliciting a response from the judge at that point. Well, at that point, the judge had twice said there was some precedent. Counsel for Palos did say that. And then the judge said, at the conclusion of that, Your Honor, that, again, she reiterated that she would keep an open mind. And that she said to court, well, thank you, Counsel. And again, I'm not making any type of announcement at this point. But when I heard this call, I did notice this case. And I did just some preliminary review of it. I was not shocked by the position that my predecessor took, whatever that was. Presumably, that could be the appointment of the special master. But again, I keep an open mind. I review every case that you provide and even follow your argument. And I'm interested in seeing your response to it. And even if that was testing, it can't be testing because it doesn't go to a substantial issue in the case. It doesn't go to the merits. And that's the problem with what Humana is proposing. Because if you look through their briefs, the test becomes very elastic. Is it a substantial issue? Is it the merits? Is it a critical issue? They won't say what the test is. Now, this court, in People v. Lawrence, said that I'm sorry. Your Honors, I see that my time is up. Thank you for your time. Thank you. Case number 10 is taken under advisement, or case number, I should say, 126008, Payless Community Hospital v. Humana and Humana Insurance Company is taken under advisement, agenda number 10. I would like to thank both Mr. Seigel and Ms. Flint for your arguments this afternoon.